IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Guardianship of: | ) | No. 78258-4-I |
| | ) | |
| CASEY LYNN URSICH, an incapacitated person, | ) | DIVISION ONE |
| | ) | |
| | ) | PUBLISHED OPINION |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GREGORY L. URSICH, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | FILED: August 26, 2019 |

HAZELRIGG-HERNANDEZ, J. — Casey Lynn Ursich seeks reversal of certain provisions of her guardianship order, arguing that the court applied the wrong legal standard in determining her residential schedule and that the provisions violate her statutory and constitutional rights. Because the court did not abuse its discretion in determining that the provisions were in Casey's best interests, we affirm.

FACTS

Casey L. Ursich is a 21-year-old incapacitated person. Her parents, Gregory L. Ursich and Kathy Lynn, divorced when she was very young. When Casey[1] was a minor, her residential time was split between her two parents' homes.

---

[1] For clarity, the parties will be referred to by their first names. We intend no disrespect.

I.      2016 Agreed Guardianship Order

As Casey approached the age of majority, Kathy filed a petition seeking to be appointed limited guardian of Casey's person and full guardian of her estate. Gregory filed a counter-petition requesting that he fill those roles. In June 2016, before the conclusion of trial, the parties entered an agreed order appointing Kathy to the contested roles. The order indicated that Casey had the right to provide input on all issues, which shall be taken into consideration by her guardian to decide who should provide her with care and assistance, and to make decisions regarding social aspects of her life. The order also specified that Casey was to make all decisions about her education, with assistance from school staff and her parents.

Casey was expected to remain in high school until the age of 21, during which time she was to reside primarily with her mother, but her residence could be changed on Casey's initiative with the agreement of her guardian. The parties agreed that it was in Casey's best interests to have continued contact with her father, and the order recommended that Casey reside with Gregory for four days of every fourteen-day period. Each visit would take place only with Casey's explicit approval after private, in-person consultation with a therapist, and Kathy was directed to "support, assist, and encourage Casey to participate in additional visitation requests." Both parents were directed to encourage communication between Casey and the other parent, and to "avoid undermining the parenting efforts of the other parent in front of Casey." The order also provided a grievance mechanism.

II.   2017 Modification of Guardianship Order

About a year later, in May 2017, Gregory moved to modify the guardianship order and replace Kathy as guardian, alleging that Casey's physical, medical, educational, and emotional conditions had deteriorated dramatically since the entry of the guardianship order. He asserted that the residential plan in the order had not been followed and Casey had only had one overnight visit with him. Gregory presented evidence that Casey had not attended school since January 10, 2017, and Kathy had canceled and failed to reschedule a meeting with school officials to discuss a possible re-entry plan. Casey's health care records indicated that she had gained a significant amount of weight in a short period of time.

Kathy responded that Casey had needed wrist surgery in September 2016, and the necessary adjustments to her medications leading up to that procedure had precipitated a mental health crisis. She asserted that Casey had begun complaining about school and refusing to attend, and Kathy felt that the school was not able to meet Casey's emotional and medical needs. She stated that Casey was responsible for her limited contact with her father.

The court stated at a hearing on the motion that, after reviewing the submissions of all parties, it was "incredibly concerned about the state of affairs." Even considering Casey's resistance to attending school and medical difficulties, the court was clear that "taking [Casey] out of her regular schedule with her friends, with structure, with socialization, with education, was not—not a choice that is or was in her best interest." The court expressed concern about the unacceptable breakdown of communication between Casey's guardian and the school, which it

felt was not in Casey's best interest. The court was also concerned by the minimal contact between Casey and Gregory, which it felt was not contemplated by the agreed order.

The court found good cause to grant the motion to modify and appointed Gregory as guardian of Casey's estate and limited guardian of her person. The court found that "[i]mminent and ongoing serious harm to Casey" had occurred due to her removal from school, minimal contact with her father, lack of engagement in physical activities, and isolation from her friends and family. The court determined that these circumstances were not in her best interests and "[w]ithout changes, the guardianship and residential arrangements in effect prior to the entry of this order will create an ongoing likelihood of serious harm to Casey." The court also found that Kathy had substantially violated the guardianship order "in many ways," including failing to consult with Gregory on educational decisions, to comply with the grievance process, and to make reasonable efforts to accomplish residential time and visits between Casey and Gregory; which all parties had agreed were in Casey's best interest.

Although Casey expressed a wish to reside primarily with her mother, the court found that she was susceptible to undue influence. The record contained a declaration from Casey's attorney in which he noted that "[i]t has become quite clear to me that Casey wants whatever her mother wants." Because she had been in the sole custody of her mother and had little contact with her father for over a year, the court found that it could not reliably determine her uninfluenced interests and preferences at the time.

The order specified a residential schedule in which Casey would reside with Gregory for nine days, then with Kathy for five days. The order stated that Casey's primary residence with her father could be "changed on Casey's initiative, subject to the court's approval following the receipt of input from Casey's attorney, GAL, and information from school and the family therapist." The court appointed a guardian ad litem (GAL) to investigate the situation and report her findings to the court, and scheduled a review hearing for six months later.

III.    2018 Order Confirming Modification

In early 2018, the GAL issued a report recommending that Gregory remain guardian of Casey's estate and that either a certified professional guardian be appointed as limited guardian of her person or that Gregory continue to fill that role. Based on Casey's expressed wishes, the report also recommended that Casey reside primarily with her mother. The GAL noted in the report that "[w]ith appropriate checks and balances in place, this Guardian ad Litem does not believe Casey's health or safety is compromised by living primarily with her mother." The GAL recommended that "the primary goal for Casey going forward is to provide all resources and opportunities to her to develop independence so that in 2–3 years she is able to move out of her parents' homes and live independently in a supported living environment." In response to this report, Gregory submitted a declaration asserting that Casey had returned to school, resumed her physical and social activities, and had not threatened to run away or leave the house while residing primarily with him.

The court held the review hearing in January 2018. Gregory argued that "[t]here would be no reason for a guardianship if we were simply following the express wishes of Casey," and all parties seemed to agree that a guardianship was necessary. He argued that the residential provisions directed Gregory and Kathy to "support a default residential schedule and not to interfere with it," but did not actually restrict Casey's actions. He also requested that the residential schedule be modified so that Casey would spend ten days with him and four with Kathy. He cited Casey's marked improvement in the previous six months in support of this request. Kathy acknowledged that Casey had improved, but argued that her improvement should not be attributed to her living situation because she was already on the path to improvement when the guardianship was modified.

The court issued an order confirming the modification of the guardianship order, which maintained Gregory as full guardian of her estate and limited guardian of her person. The court stated that under RCW 11.88.120(1) it had the authority to modify a guardianship for good reason and to grant relief "as it deems just and in the best interest of the incapacitated person." The court found that it was in Casey's best interests to spend time with each of her parents and did not disturb the five-day/nine-day residential split in favor of her father, finding that the schedule was also in her best interests. The order directed Gregory and Kathy to "manage housing for Casey" by transporting her to the other parent's residence on specified days. The parents were ordered not to make any effort to reside with Casey outside the designated time without the agreement of the other parent, "prior to contacting Casey Ursich for any discussion of a proposed change, until further

order of this Court." The court identified the most significant fact bearing on its decision as Casey's significant improvement since the order granting the motion to modify the guardianship. The court also found that Gregory had acted in Casey's best interests since he was appointed guardian.

Casey moved for reconsideration through her counsel, arguing that the court failed to consider the GAL's report and Casey's own expressed wishes. The court denied the motion, indicating in a written order that it "carefully considered the desire of Casey Lynn Ursich as well as the GAL report and recommendations when issuing its prior ruling. Based on Casey's desires and GAL's recommendation, the mother's residential time was increased by one day." Casey expressed confusion regarding this ruling in a subsequent motion because there was no increase in the number of days that she was to reside with her mother. The court stated that it had increased Casey's time with her mother by "reject[ing] the residential schedule proposed by the Guardian and grant[ing] the Mother 5 days with Casey instead of the 4 day residential rotation urged by the Father." Casey appealed.

## DISCUSSION

Casey contends that the court erred in imposing a residential schedule under which she would reside primarily with her father, contrary to her stated wishes.

The superior court has the authority to appoint guardians for the persons and/or estates of incapacitated persons. RCW 11.88.010(1)[2]. A court may deem

---

[2] Chapters 11.88 RCW and 11.92 RCW were repealed by Laws of 2019, chapter 437, but the repeal will not take effect until January 1, 2021.

a person incapacitated as to their person when it finds that they have "a significant risk of personal harm based upon a demonstrated inability to adequately provide for nutrition, health, housing, or physical safety." RCW 11.88.010(1)(a). Similarly, a court may deem a person incapacitated as to their estate when it finds that they are "at [a] significant risk of financial harm based upon a demonstrated inability to adequately manage property or financial affairs." RCW 11.88.010(1)(b). The court also has the authority to appoint limited guardians for the persons or estates of incapacitated persons if they are capable of managing some of their personal and financial affairs, but still require some protection and assistance. RCW 11.88.010(2). In this instance, the court shall impose "only such specific limitations and restriction on an incapacitated person to be placed under a limited guardianship as the court finds necessary for such person's protection and assistance." Id.

We review the superior court's management of a guardian for abuse of discretion. In re Guardianship of Cornelius, 181 Wn. App. 513, 528, 326 P.3d 718 (2014). A trial court abuses its discretion only when no reasonable person would take the view adopted by the trial court. In re Guardianship of Johnson, 112 Wn. App. 384, 48 P.3d 1029 (2002). We accept unchallenged findings of fact as true for the purposes of appeal, while we review challenged findings of fact for substantial evidence. In re Estate of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004). "Substantial evidence is evidence that is sufficient to persuade a rational, fair-minded person of the truth of the finding." Id. We defer to the trial court on

determinations of "the persuasiveness of the evidence, witness credibility, and conflicting testimony." In re Knight, 178 Wn. App. 929, 937, 317 P.3d 1068 (2014).

I.    Substituted Judgment Versus Best Interests Analysis

Casey contends that the trial court erred in using a "best interests" analysis rather than a "substituted judgment" analysis to determine her primary residence. After a guardianship is established, the court may modify the guardianship or replace the guardian or limited guardian "as it deems just and in the best interest of the incapacitated person." RCW 11.88.120(1)(a). The court is the superior guardian of the incapacitated person, while the person appointed guardian is considered an officer of the court and is under the court's direction and control in that capacity. Cornelius, 181 Wn. App. at 523; RCW 11.92.010.

In support of her argument for a substituted judgment analysis, Casey analogizes this case to those involving medical treatment decisions for incompetent persons. Casey cites two Washington Supreme Court cases for the proposition that "the goal of a guardianship is to do what the incapacitated person would do, if she were competent to make the decision in question." Matter of Guardianship of Ingram, 102 Wn.2d 827, 838, 689 P.2d 1363 (1984); Raven v. Dep't of Soc. and Health Servs., 177 Wn.2d 804, 817, 306 P.3d 920 (2013). However, the factual distinctions of these cases from the current case do not demonstrate that the Supreme Court intended this test to apply in this context.

In Ingram, the court considered a guardian's responsibilities in determining a course of medical treatment for an incapacitated person diagnosed with throat cancer. 102 Wn.2d at 832. The court first considered whether the appointed

guardian was required to seek court approval under former RCW 11.92.040(3) (1984), recodified as RCW 11.92.043(1)(f), before consenting to a proposed laryngectomy. Id. at 836. That statute required a guardian to act in the ward's best interests to provide timely, informed consent to necessary medical procedures, but specified certain procedures for which the guardian could not provide consent before petitioning the court. Id. at 836–37 (citing former RCW 11.92.040(3)). The court found that "[t]he apparent intent of the statutory exclusions to the guardian's powers is to require court approval before the guardian may consent to highly intrusive, irreversible medical treatment." Id. at 837. Once the guardian had petitioned the court for approval, the substituted judgment analysis applied to its substantive treatment decision. Id. at 838.

More recently, Raven considered whether a guardian was neglectful when she declined to place her ward in a nursing home facility based on a good-faith determination that the ward, when competent, had consistently refused to be placed in a nursing home. Raven, 177 Wn.2d at 809, 811. When discussing the guardian's duties in determining a health care plan, the court looked to a statute specifically governing informed consent for patients who are not competent. Id. at 819. The statute specified that a person authorized to provide informed consent on behalf of an incapacitated person "must first determine in good faith that that patient, if competent, would consent to the proposed health care." Id. (emphasis omitted) (citing RCW 7.70.065(1)(c)). The court noted that the statute's "substitute judgment provision requires the guardian to determine what the ward would want if competent. If that determination cannot be made, then the guardian may act in

- 10 -

the ward's best interests." Id. at 821. Although Raven uses Ingram to illustrate the substitute judgment analysis, the informed consent statute is the controlling authority requiring the court to apply that standard.

Absent a statute mandating use of the substituted judgment standard for a circumstance as highly intrusive and irreversible as surgical removal of an organ, there does not seem to be a basis to depart from the best interests standard specified by RCW 11.88.120(1)(a). The court did not err in applying the best interests standard when considering the motion to modify the guardianship order.

II. Statutory and Constitutional Rights

Casey challenges the following findings of fact and conclusions of law from the 2018 order:

> E. It is in Casey Ursich's best interest to spend time with both her father and her mother and the residential schedule outlined below is in her best interests.
> F. The Court specifically inquired and all parties agreed that Casey Ursich has improved significantly since the July 17, 2017 Order Granting Motion to Modify, Appointing Gregory Ursich as Guardian and Appointing Guardian ad Litem. This is the most significant fact bearing on the Court's decision and will guide any future decisions of this Court.
> G. The Guardian, Gregory Ursich, has acted in Casey Ursich's best interest since the July 17, 2017 Order Granting Motion to Modify, Appointing Gregory Ursich as Guardian and Appointing Guardian ad Litem was entered.

She also assigns error to the section of the order detailing her parents' responsibilities regarding management of her housing.

Throughout this guardianship action, the parties have agreed on paper, if not always by their actions, that continued contact with both of her parents is in Casey's best interests. Kathy agreed at the hearing that Casey had shown

- 11 -

improvement since the modification of the guardianship. Casey does not provide any argument that Gregory did not act in her best interests from the time of the 2017 order modifying the guardianship to the 2018 order confirming the modification. Casey appears to be challenging whether the residential schedule in the order is in her best interests and whether the court appropriately relied on her improvement as the most significant fact bearing on its determination.

Casey argues that the residential schedule violated her statutory and constitutional rights to autonomy and association and that the court's failure to give appropriate weight to her preferences violated her right to procedural due process.

A. Right to Autonomy and Association

The Washington State Legislature has recognized that some people with incapacities require the help of a guardian to exercise their rights and provide for their basic needs. RCW 11.88.005. However, the legislature's intent in enacting statutes governing guardianships is to "protect the liberty and autonomy of all people of this state, and to enable them to exercise their rights under the law to the maximum extent, consistent with the capacity of each person." Id. A guardianship should restrict an incapacitated person's liberty and autonomy "only to the minimum extent necessary to adequately provide for their own health or safety." Id.

An incapacitated person retains the right to associate with persons of their choosing. RCW 11.92.195(1). This right includes the right to freely communicate and interact with other persons via in-person visits, or telephonic or electronic means. Id. "A guardian or limited guardian may not restrict an incapacitated

- 12 -

person's right to communicate, visit, interact, or otherwise associate with persons of the incapacitated person's choosing," unless the court authorizes such a restriction, a protection order forbids the contact, or the guardian has good cause to believe the contact would cause harm to their ward. RCW 11.92.195(2).

A guardianship by its nature entails some limitation on an incapacitated person's liberty and autonomy for their own protection and assistance. An incapacitated person's expressed wishes and best interests are not necessarily the same. Johnson, 112 Wn. App. at 389. The trial court found that Casey had suffered actual harm when residing primarily with her mother. This finding was supported by substantial evidence showing the she had stopped attending school and participating in her usual physical activities, become isolated from her friends and family, and expressed suicidal ideation. The court also found that Casey's condition had improved in the time she was residing primarily with her father. This finding was supported by substantial evidence and agreed to by both of her parents.

Casey argues that the GAL's determination that Casey would not be harmed by residing primarily with her mother shows that the court abused its discretion. However, the court is not bound by the recommendations of a GAL. Fernando v. Nieswandt, 87 Wn. App. 103, 107, 940 P.2d 1380 (1997). A reasonable person could disagree with the GAL's conclusion that Casey would likely not be harmed by residing primarily with her mother, and find that this living situation would not be in Casey's best interests.

Gregory argues that the trial court did not infringe on Casey's rights because "the residential schedule outlined in the 2018 Order is carefully crafted to restrict not Casey, but her parents, by establishing a default schedule that Gregory and Kathy are to make best efforts to follow without improperly influencing Casey." The language of the residential provision, which specifically instructs Casey's parents in how to manage Casey's housing but does not direct Casey herself, supports this argument. The 2018 order also provides that all of Casey's "authorities, duties, rights, and obligations" enumerated in the 2016 agreed order, the 2017 order modifying the guardianship, and another order clarifying the 2017 order remain unchanged to the extent that they are not inconsistent with the 2018 order. Therefore, the provision of the 2017 order establishing a procedure for Casey to change her housing arrangement remains in effect.

The trial court did not abuse its discretion in finding that the residential schedule in which Casey would reside primarily with her father was in her best interests and restricted her rights only to the extent necessary to protect her health and safety.

B. Procedural Due Process

Casey argues that the court violated her constitutional right to procedural due process because it failed to give appropriate weight to her expressed preferences. We review constitutional challenges de novo. City of Redmond v. Moore, 151 Wn.2d 664, 668, 91 P.3d 875 (2004). No state shall deprive a person of life, liberty, or property without, at a minimum, notice and an opportunity to be heard. Cornelius, 181 Wn. App. at 530 (citing Amunrud v. Bd. of Appeals, 158

- 14 -

Wn.2d 208, 216, 143 P.3d 571 (2006); <u>Soundgarden v. Eikenberry</u>, 123 Wn.2d 750, 768, 871 P.2d 1050 (1994)). Notice to the party must be reasonably calculated to inform the party of the pending action and of the opportunity to object. <u>State v. Dolson</u>, 138 Wn.2d 773, 777, 982 P.2d 100 (1999). The party's opportunity to be heard must be meaningful in time and manner. <u>Cornelius</u>, 181 Wn. App. at 530.

Assuming that Casey has a liberty interest in determining her residence, her procedural due process rights were not violated. She appears to have received notice of all pleadings filed and hearings scheduled through her own independent counsel. She filed a number of responsive pleadings during the pendency of the motion to modify the guardianship expressing her preferences and objections, and the court indicated that it had reviewed these documents. Casey does not appear to argue that she was denied appropriate notice and opportunity to be heard. She does not provide any authority suggesting that the court's failure to decide the issue in accordance with her wishes constituted a denial of due process. This claim has no merit.

III.    Motion for Reconsideration

Casey assigns error to the court's denial of her motion for reconsideration of the 2018 order confirming the guardianship modification. She contends that the court's inaccurate comment that it had increased Casey's residential time with Kathy shows that the court abused its discretion in imposing the residential schedule in the 2018 order. Casey provides no further argument that the court erred in denying the motion for reconsideration. "Passing treatment of an issue or

lack of reasoned argument is insufficient to merit judicial consideration." Holland v. City of Tacoma, 90 Wn. App. 533, 538, 954 P.2d 290 (1998) (citing State v. Johnson, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992)); RAP 10.3(a)(6). We decline to review the denial of the motion for reconsideration on any separate grounds.

Although the court's comment that it had increased Casey's time with Kathy by not decreasing it was perhaps unartfully phrased, it appears the court intended to demonstrate that it had considered the input of Casey, Kathy, and the GAL, and not simply taken Gregory's assertions at face value. This statement does not indicate that the court's decision was manifestly unreasonable. The court did not err in denying the motion for reconsideration.

Affirmed.

WE CONCUR: